Citation Nr: 1205184 
Decision Date: 02/10/12 Archive Date: 02/23/12

DOCKET NO. 09-46 659A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for an acquired psychiatric disorder to include posttraumatic stress disorder (PTSD).

2. Entitlement to an effective date earlier than July 22, 2008 for a 60 percent rating for dermatographism.

3. Entitlement to a rating in excess of 40 percent for palindromic rheumatism of the left hand.

4. Entitlement to a compensable rating for palindromic rheumatism of the right hand.

5. Entitlement to a rating in excess of 10 percent for palindromic rheumatism of the left knee.

6. Entitlement to a rating in excess of 10 percent for palindromic rheumatism of the right knee.

7. Entitlement to a rating in excess of 10 percent for palindromic rheumatism of the left hip.

8. Entitlement to a rating in excess of 10 percent for palindromic rheumatism of the right hip.

9. Entitlement to a rating in excess of 10 percent for palindromic rheumatism of the feet.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

Appellant and his spouse


ATTORNEY FOR THE BOARD

M. H. Stubbs, Associate Counsel


INTRODUCTION

The Veteran served on active duty from March 1980 to March 1984, and from July 1984 to January 2004.

These matters come before the Board of Veterans' Appeals (Board) on appeal from January and August 2009 rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida.

The Veteran and his spouse appeared and testified at a personal hearing in July 2011 before the undersigned Veterans Law Judge sitting in St. Petersburg, Florida. A transcript of the hearing is contained in the record.

The issues of entitlement to service connection for palindromic rheumatism of the cervical and lumbar spine, and right elbow; entitlement to service connection for a gastrointestinal disorder; whether new and material evidence has been provided to reopen a claim of entitlement to service connection for hypertension, to include as secondary to palindromic rheumatism; and entitlement to an increased rating for palindromic rheumatism of the left elbow, have been raised by the record, but have not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over them, and they are referred to the AOJ for appropriate action. 

The issues of entitlement to increased ratings for palindromic rheumatism of the left hand, right hand, left knee, right knee, left hip, right hip, and feet; as well as the issue of entitlement to service connection for an acquired psychiatric disorder to include posttraumatic stress disorder are addressed in the REMAND portion of the decision below and is REMANDED to the RO via the Appeals Management Center (AMC), in Washington, DC.


FINDING OF FACT

During a July 2011 Board hearing, the Veteran withdrew his claim of entitlement to an effective date earlier than July 22, 2008 for a 60 percent rating for dermatographism.



CONCLUSION OF LAW

The criteria for withdrawal of an appeal by the appellant have been met. 38 U.S.C.A. § 7105(b)(2), (d)(5) (West 2002 & Supp. 2011); 38 C.F.R. § 20.204 (2011). 


REASONS AND BASES FOR FINDING AND CONCLUSION

The Board may dismiss any appeal which fails to allege specific error of fact or law in the determination being appealed. 38 U.S.C.A. § 7105. An appeal may be withdrawn as to any or all issues involved in the appeal at any time before the Board promulgates a decision. 38 C.F.R. § 20.204. Withdrawal may be made by the appellant or by his authorized representative. 38 C.F.R. § 20.204. In the present case, the Veteran, during his July 2011 Board hearing withdrew his appeal to the claim of entitlement to an earlier effective date for a 60 percent rating for dermatographism. Hence, there remains no allegations of errors of fact or law for appellate consideration. Accordingly, the Board does not have jurisdiction to review this appeal and it is dismissed.


ORDER

The appeal regarding a claim of entitlement to an earlier effective date prior to July 22, 2008 for a rating of 60 percent for dermatographism is dismissed.


REMAND

The Veteran claims entitlement to increased ratings for palindromic rheumatism of the left hand, right hand, left knee, right knee, left hip, right hip, and feet. These disorders are currently rated by analogy to 38 C.F.R. § 4.71a, Diagnostic Code 5002 (2011), i.e., the Diagnostic Code for rheumatoid arthritis.

In reviewing the rating criteria under Diagnostic Code 5002 the Board observes that it must initially be determined whether the disorder is or is not active. By definition palindromic rheumatism causes sudden attacks of joint pain and swelling, typically in the hands and feet. An episode of palindromic rheumatism may last from just a few hours to several days. http://www.mayoclinic.com/health/palindromic-rheumatism/HQ01171 Given the potential short duration of an episode, it is possible that, notwithstanding the appellant's assertion that he is in constant pain, securing an examination during an active phase may be difficult. 

The Board also observes, however, that a laboratory test, i.e., the anti-CCP antibody study is positive in 55% of patients with palindromic rheumatism. A positive result also suggests likely evolution on to rheumatoid arthritis. If the anti-CCP antibody study is positive in a patient with rheumatoid arthritis, it increases likelihood of erosive type disease, i.e., a more aggressive form of the disease. http://www.sandiegoarthritis.com/html/testslab.htm 

Significantly, while an anti-CCP antibody study in May 2009 was negative, the significance of that finding was not explained. Moreover, while a rheumatologist in April 2010 stated that the appellant was seronegative for rheumatoid arthritis, palindromic rheumatism and spondyloarthropathy, no examiner has suggested that seronegativity is the definitive measurement by which the disease process can be declared "inactive." Given that the Board must first determine whether the disorder is active, it follows that further development is required. Indeed, VA's duty to assist includes the duty to conduct a thorough and contemporaneous medical examination which is accurate and fully descriptive. Floyd v. Brown, 9 Vet. App. 88, 93 (1996); Green v. Derwinski, 1 Vet. App. 121, 124 (1991). Further, the Board must leave medical determinations to professionals where the facts are not clear as to a veteran's condition. See Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991) (If medical evidence of record is insufficient, the Board must supplement the record by seeking an advisory opinion or ordering a medical examination.) In light of the factors discussed above, further development is required.

The Veteran also claims entitlement to service connection for an acquired psychiatric disorder to include posttraumatic stress disorder. Service connection for posttraumatic stress disorder requires medical evidence diagnosing the condition in accordance with 38 C.F.R. § 4.125(a) (2011); a link, established by medical evidence, between current symptoms and an in-service stressor; and credible supporting evidence that the in-service stressor occurred. See 38 C.F.R. § 3.304(f). 

In this case, the Veteran contends that he currently suffers from posttraumatic stress disorder as a result of several stressors from military service, including: 

* Serving temporary duty from the USS John F. Kennedy in October 1983 when a truck came through a checkpoint in Beirut, Lebanon and killed 238 Marines and others; 

* Between March and June 1999, while aboard the USS Ross, being exposed to constant missile strikes, and knowing that a missile fired from his ship went astray and killed civilians, including women and children; 

* During "BALTOPS 2000" a serviceman aboard the USS Ross was killed by a lathe machine right in front of the Veteran;

* While aboard the USS Barney in 1984, the Veteran allegedly helped to secure a merchant ship that had been damaged by missiles and was being chased by "Iranians in P.T. boats." At this time the Veteran alleges that he saw many injured men aboard the ship, including a man who had been decapitated. 

* Being fearful of friendly fire when bombs were dropped nearby and the smoke was too thick for U.S. forces to see his team from above while allegedly performing temporary duty to assist a mobile communications in support of SEAL operations. 

Significantly, the Veteran reported that postservice, as a civilian contractor in Iraq between 2006 and 2008 he witnessed death and destruction.

In January 2009, the RO issued a formal finding of a lack of information require to verify the Veteran's stressors. Part of the memorandum noted that there were no stressful events noted in the Veteran's personnel records, and that the appellant had not returned a PTSD questionnaire. Notably, the Veteran provided stressor information in his September 2008 claim for service connection. Further, there is no indication that the RO contacted the Joint Services Records Research Center (JSRRC) in an attempt to verify any of the Veteran's provided stressors. Lastly, during his July 2011 Board hearing, the Veteran provided the name of the individual who died aboard the USS Ross following an accident with a lathe machine. 

On remand, the RO/AMC (Appeals Management Center) must attempt to obtain the Veteran's complete service personnel record from all official sources, to include, but not necessarily limited to the National Personnel Records Center in an attempt to obtain data to verify the Veteran's stressors. Thereafter, the appellant should be afforded a VA examination to determine the nature and etiology of any diagnosed posttraumatic stress disorder. McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

Accordingly, the case is REMANDED for the following action:

1. On remand, the RO/AMC must attempt to obtain the Veteran's complete service personnel record from all official sources, to include, but not necessarily limited to the National Personnel Records Center in an attempt to obtain data to verify the claimed stressors. If any pertinent record is not available, or if the search for the records yields negative results, the RO/AMC must specifically document the attempts that were made to locate them. The RO/AMC must also explain in a written unavailability memorandum why further attempts to locate or obtain any government records would be futile, which must be associated with the appellant's claims file. The RO/AMC must then: (a) notify the claimant of the specific records that it is unable to obtain; (b) explain the efforts VA has made to obtain that evidence; and (c) describe any further action it will take with respect to the claims. The claimant must then be given an opportunity to respond. 

2. The Veteran should be contacted and requested to identify any health care provider who has treated his palindromic rheumatism since August 2010. Thereafter, the RO must undertake efforts to secure those records. If the RO cannot locate such records, the RO must specifically document the attempts that were made to locate them, and explain in writing why further attempts to locate or obtain any government records would be futile. The RO must then: (a) notify the claimant of the specific records that it is unable to obtain; (b) explain the efforts VA has made to obtain that evidence; and (c) describe any further action it will take with respect to the claims. The claimant must then be given an opportunity to respond.

3. Following receipt of any additional data from National Personnel Records Center, JSRRC, or any other source, as well as the completion of any additional development suggested by any of the aforementioned organizations, the RO must prepare a report detailing the nature of any independently verified in-service stressor. If no stressor is verified, the RO/AMC must should so state in its report. The basis for these findings must be documented in the claims file. The report and determination must be added to the claims file. 

4. Thereafter, the Veteran should be afforded a VA psychiatric examination. The purpose of any examination is to ascertain the nature and etiology of any and all diagnosed psychiatric disorders. The claims folder in its entirety must be furnished to the examiner for use in the study of this case. The examiner is to conduct a comprehensive mental status evaluation. Any indicated diagnostic studies, including psychological testing and posttraumatic stress disorder subscales, must be accomplished if deemed warranted by the examiner. All established psychiatric diagnoses are then to be fully set forth. 

Following the examination, the psychiatrist is to address the following with full supporting rationales:

* Does the Veteran have any acquired psychiatric disorder, to include posttraumatic stress disorder? 

* If so, is it at least as likely as not, i.e., is there a 50/50 chance, that any diagnosed psychiatric disorder is the result of service to include any independently verified in-service event? 

The examiner's report must include his/her opinion as to the presence or absence of a link between the appellant's current symptoms and any independently verified in-service stressor. 

If the Veteran's diagnosed psychiatric disorder is deemed to be as a result of "fear of hostile military or terrorist activity," the examiner should indicate, if possible, whether the "fear of hostile military or terrorist activity" is as a result of military service or whether it is more likely than not due to POSTSERVICE civilian employment in Iraq.

A complete rationale must be provided for any opinion offered.

5. The Veteran is also to be scheduled for a comprehensive examination by a board certified rheumatologist. The claims folders must be available to and reviewed by the rheumatologist. The examiner must provide through range of motion studies for the appellant's hands, knees, hips and feet. The nature of any flare-ups, and any additional lost motion during flare-ups must be addressed.

In preparing the examination report the examiner must define what "active" palindromic rheumatism is. What is the basis for the definition offered? 

Based on the definition offered the examiner must conduct all appropriate studies, to include if appropriate an anti-CCP antibody test, to determine whether the appellant's palindromic rheumatism is currently active. Further, the rheumatologist must carefully review the entire record in each file and state whether at any time since April 2008, the appellant's palindromic rheumatism has been active. If so the dates of that activity must be identified. A complete rationale must be provided for any opinion offered.

6. The Veteran is to be notified that it is his responsibility to report for the ordered examinations and to cooperate in the development of the claim. The consequences for failure to report for any VA examination without good cause may include denial of the claims. 38 C.F.R. §§ 3.158, 3.655 (2011). In the event that the claimant does not report for any scheduled examination, documentation should be obtained which shows that notice scheduling the examination was sent to the last known address. It should also be indicated whether any notice that was sent was returned as undeliverable. 

7. Thereafter, the RO/AMC must readjudicate all claims save for the issue dismissed above. If any benefit sought is not granted, the Veteran and his representative must be furnished with a supplemental statement of the case and afforded an opportunity to respond before the file is returned to the Board for further appellate consideration. 

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2011).


______________________________________________
DEREK R. BROWN
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs